IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANTHONY MELANSON, | § | |
| | § | |
| Plaintiff-counterdefendant, | § | |
| | § | Civil Action No. 3:13-CV-2018-D |
| VS. | § | |
| | § | |
| NAVISTAR, INC., | § | |
| | § | |
| Defendant-counterplaintiff. | § | |

MEMORANDUM OPINION
AND ORDER

In this lawsuit arising from plaintiff's relocation from Ontario, Canada to Garland, Texas in connection with his employment, defendant moves for summary judgment on plaintiff's claims for breach of contract and breach of fiduciary duty. For the reasons explained, the court grants the motion.

I

Plaintiff Anthony Melanson ("Melanson"), a Canadian citizen who is not a permanent U.S. resident, began working for defendant Navistar, Inc. ("Navistar") in 1993 at an assembly plant in Chatham, Ontario, Canada.[1] Until 2009 Melanson held various positions with Navistar, including industrial engineer, maintenance supervisor, and manager of special projects. In 2009 Navistar began the process of shutting down the Chatham facility. For

---

[1]In deciding Navistar's summary judgment motion, the court views the evidence in the light most favorable to Melanson as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

several months, Melanson and approximately 20 other supervisors assisted with shutting down and cleaning up the facility.

In late 2009 and early 2010, Melanson began working for Navistar on various short-term assignments at several locations in the United States.  He primarily traveled to Conway, Arkansas and Tulsa, Oklahoma to assist in relocating Navistar's bus assembly operations from Conway to Tulsa.  Melanson then worked in Tulsa on various manufacturing projects for Navistar until mid-2011.  While on "international assignment," Melanson remained an employee of Navistar Canada, was kept on the Navistar Canada payroll, was paid in Canadian currency, and continued to maintain his home in Canada.

From the time he began traveling to U.S. locations, Melanson relied on Navistar to ensure that he was legally allowed to work in the United States.  Navistar hired a law firm as outside immigration counsel to submit the proper paperwork to secure authorization for Melanson to work on projects in the United States.  In July 2010 Melanson obtained an L-1B visa,[2] which was valid from July 16, 2010 to June 30, 2013.  Melanson's passport, however, was stamped with an expiration date of July 15, 2013, and U.S. customs officials informed Melanson that July 15, 2013 was the date his visa expired.

In 2011 Phil Pinsonneault ("Pinsonneault"), who had supervised Melanson for several years at the Chatham facility, asked Melanson to assist with maintenance problems that Navistar was having at its assembly plant in Garland, Texas.  Pinsonneault, who was also a

---

[2]*See infra* note 3.

Canadian national, had begun working at the Garland facility in March 2011 as its Technical Services Manager after permanently relocating to Texas from Canada.  In August 2011 Pinsonneault and Craig Holmes ("Holmes"), the Garland Plant Manager, recruited Melanson to work in Garland on a permanent basis as a Maintenance Manager.  Melanson did not want to relocate to the United States without an assurance that he would be able to stay in the United States long-term.  During a conversation with Joel Aguirre ("Aguirre"), who was then the Human Resources Manager at the Garland plant, Melanson requested that his visa be changed from an L-1B to an L-1A[3] classification, and that the company sponsor his application for permanent residence in the United States.[4]  According to Melanson, Aguirre told him that "he would work with corporate HR" on Melanson's request.  D. App. 47.

Navistar subsequently provided Melanson a formal written job offer for the Maintenance Manager position at the Garland assembly plant (the "Offer Letter").  On September 9, 2011 Melanson signed the Offer Letter and accepted the position.  The Offer

---

[3]The L-1B non-immigrant classification enables a U.S. employer to transfer a *professional employee* with specialized knowledge relating to the organization's interests from one of its affiliated foreign offices to one of its offices in the United States.  The L-1A non-immigrant classification, by contrast, enables a U.S. employer to transfer an *executive or manager* from one of its affiliated foreign offices to one of its offices in the United States.

[4]Permanent residence is the immigration status of a person authorized to live and work in the United States on a permanent basis.  *See* 8 U.S.C. § 1101(a)(20) (" The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.").  A "green card" is the permit that memorializes this status.  *See, e.g., Munoz v. Holder*, ___ F.3d ___, 2014 WL 2782233, at *1 n.1 (5th Cir. June 19, 2014).

Letter stated that the position was a lateral move and that Melanson's base salary would remain the same, but would be converted to U.S. currency.  It also included a paragraph entitled "Relocation" that stated: "Relocation will be provided under the Navistar Global Relocation Policy G-140.  You will be transitioned to a Navistar US employee at the time your US immigration paperwork allows."  D. App. 57.  And it contains a paragraph entitled "At-Will Employment" that provides:

> Please be aware that your employment with Navistar is, at all times, at-will, meaning that either you or Navistar Inc. may terminate the relationship for any reason, with or without cause, and with or without advance notice.  Nothing contained in this offer of employment, or in any other materials provided to you in connection with your employment shall be construed as a contract or promise of employment between you and the Company, require the Company to have "just cause" to terminate you, or otherwise restrict the Company's right to terminate you at any time or for any reason.

*Id.*

Lori MacDonald ("MacDonald"), a senior Human Resources Manager for Navistar, drafted the Offer Letter.  According to MacDonald, Navistar did not have a standard U.S. immigration policy in effect at the time Melanson transferred to Garland in 2011, and each individual plant or business unit had its own immigration practices.  But after Melanson relocated to Texas, Navistar created a standard, written U.S. immigration policy, with an effective date of January 1, 2012, that applied to all business units (the "2012 Immigration Policy").  The 2012 Immigration Policy, *inter alia*, establishes eligibility criteria for employees who want to be considered for permanent-residence sponsorship.  It is undisputed

- 4 -

that Melanson satisfied these eligibility criteria during the relevant period.

In late April 2012 Melanson sent an email to Aguirre asking when his visa status would be updated and stating that he "would like to get started obtaining [his] green card." D. App. 65.   Aguirre forwarded the email to Susan Brown ("Brown"), a Navistar Immigration Specialist.  Brown responded to Melanson, asking that he clarify what he meant by "updating his visa status."  Melanson replied that he had been "told that [his] visa was to be changed when [he] accepted the relocation from Chatham to Garland."  *Id.* at 64.  About two weeks later, Brown informed Melanson that she had forwarded an email to an attorney at the law firm that had assisted Melanson earlier with the L-1B process.

Melanson did not hear from Brown for several months.  On October 16, 2012 he sent Brown a follow-up email explaining that he had not heard back from Navistar about his request.  In his email, he asked whether there was something he needed to do to resolve the issue.  Brown responded two days later, apologizing for the delay and informing Melanson that Navistar's policy was to initiate a visa change of status only if Navistar determined that it was a "business necessity."  *Id.* at 62.  Brown's email outlined two options for him to obtain an L-1A classification.  She concluded by stating: "Since your L-1B will be expiring on 06/30/2013, we can check with outside counsel about the possibility of changing to L-1A and . . . determine if you qualify for [the] EB-1 immigrant visa category."  *Id.* (bracketed material and ellipsis added).

On October 30, 2012 Navistar announced that it would permanently close the Garland facility.  Navistar initially provided Melanson with a Worker Adjustment and Retraining

Notice ("WARN notice") that his last day of employment would occur during the 14-day period commencing on December 31, 2012.   On November 29, 2012 Melanson sent MacDonald an email in which he complained about Navistar's delay in responding to his inquiries regarding a change in his visa classification and informed her that he and his wife intended to move back to Canada.   The last paragraph of the email stated:

> My wife and I are disappointed with the way the company handled this whole situation and we have made a decision to return to Canada.  Based on my Warn Notification I am asking for my separation package and end date.  We are now in the process of selling our home and I have [begun] to seek employment in Canada.

*Id.* at 278 (bracketed material added).

Once the Garland plant closure was announced, Navistar informed its affected employees that it would try to relocate them to its other U.S. locations.   On December 5, 2012 Bob Markowitz ("Markowitz"), a Navistar manager, contacted Melanson regarding a potential position with technical services at Navistar's facility in Springfield, Ohio. Melanson told Markowitz that he was not interested in relocating to Ohio and that he would consider the position only if he could commute from Canada.   Markowitz responded by asking Melanson to work with corporate HR on "location/travel options."  *Id.* at 75.

On December 11, 2012 Jeff Vandermeersch ("Vandermeersch"), another Navistar manager, emailed Melanson about an opportunity for different project work with the company.  Melanson responded: "Sounds good but the company has not provided any option at this point.  I am looking for work in Canada already and [my] house is listed here.  Made

my intentions known to Corp HR a few weeks ago." *Id.* at 77 (bracketed material added). Vandermeersch encouraged Melanson to ask MacDonald about the opportunity. Melanson then replied: "[MacDonald] is aware of my intentions. Canada was [the] only option to relocate that I would agree to and if she wants to retain my services with the company she will have to provide the option. I have no desire to chase her for any more answers at this point! I offered to work for AME from Canada but if no option happens and house sells [I'm] history." *Id.* (bracketed material added).

Suk Singh ("Singh"), a manager at Navistar's facility in Tulsa, Oklahoma, also contacted Melanson about a position in Tulsa, although the record is not clear concerning when this contact was initiated. Melanson told Singh he was not interested because, in his view, the position was not comparable to his prior position as Maintenance Manager. Although Melanson was in contact with Markowitz, Vandermeersch, and Singh about potential job opportunities with Navistar, he did not receive a formal written offer for a position at another U.S. location during this period.

Melanson filed the instant suit against Navistar, asserting a claim for breach of contract based on two grounds and a claim for breach of fiduciary duty. Melanson alleges that Navistar breached a contract with him by failing to support him in obtaining permanent residence status in the United States in exchange for his agreement to transfer to the Garland assembly plant. He asserts that Navistar breached a fiduciary duty to him by failing to assist him in obtaining permanent residence status in the United States. In the alternative to his first breach of contract theory, he asserts that Navistar breached a contract by failing to honor

the Navistar International Assignment Program Policy, which provides that employees on international assignment are entitled to reimbursement for moving and repatriation expenses at the conclusion of their international assignment. Navistar has filed a counterclaim asserting claims for unjust enrichment, "money had and received," and promissory estoppel. Navistar moves for summary judgment on Melanson's claims. Melanson opposes the motion.[5]

II

Because Melanson will bear the burden of proof on his claims for breach of contract and breach of fiduciary duty, Navistar can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the claim in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Navistar does so, Melanson must go beyond his pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable trier of fact could return a verdict in Melanson's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Melanson's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if Melanson fails to meet this burden. *Little*, 37 F.3d at 1076.

---

[5]Navistar does not move for summary judgment on the grounds of its counterclaim. *See infra* § VI.

III

Navistar moves for summary judgment dismissing Melanson's breach of contract claim that is based on Navistar's alleged failure to support his application for permanent residence.  Navistar contends that Melanson cannot establish a valid contract, a breach of a contractual obligation, or damages from Navistar's alleged failure to start the green card process.

A

"A breach of contract claim under Texas law requires proof of four elements: (1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3) defendants' breach of the contract, and (4) damages to plaintiff resulting from the breach." *Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F.Supp.2d 866, 872 (N.D. Tex. 2013) (Fitzwater, C.J.) (citation and internal quotation marks omitted).  "For there to be a valid contract, there must be '(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding.'" *Erdman Co. v. USMD of Arlington GP, LLC*, 2011 WL 1356920, at *15 (N.D. Tex. Apr. 11, 2011) (Fitzwater, C.J.) (quoting *Prime Prods. v. S.S.I. Plastics*, 97 S.W.3d 631, 636 (Tex. App. 2002, pet. denied)).  "The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind." *In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012) (quoting *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App. 1999, pet. denied)) (internal quotation marks omitted).  "[A] meeting of the minds refers to

- 9 -

a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract." *Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 362 (5th Cir. 2013) (per curiam) (citing *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App. 2010, pet. denied)). "The essential terms must be defined 'with sufficient precision to enable the court to determine the obligations of the parties.'" *Id.* (quoting *New Process Steel, L.P. v. Sharp Freight Sys.*, 2006 WL 947764, at *3 (Tex. App. Apr. 13, 2006, no pet.)). "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App. 2004, pet. denied).

B

Navistar posits that Melanson cannot identify a written or oral agreement with sufficiently definite terms to give rise to a contractual obligation of Navistar to sponsor his application for permanent residence. Melanson does not clearly respond to this contention. The facts section of his response brief mentions the oral conversation between Aguirre and Melanson before Melanson relocated from Canada to Texas, the Offer Letter, and the 2012 Immigration Policy, but the argument section of the brief does not specify which of these factual predicates, if any, provides the basis for Melanson's breach of contract theory. Instead, Melanson asserts that "an objective review of the parties' actions raises a question of fact as [to] the parties' intentions to enter into a binding agreement regarding Melanson's permanent residency application." P. Resp. Br. 16 (bracketed material added). He contends that the existence of a contract between him and Navistar can be inferred from the following

actions: (1) Navistar and its outside immigration counsel identified Melanson as an employee to be transitioned to L-1A visa status, which would make the subsequent application for permanent residence status less burdensome, and fees for his L-1A petition were prepaid to Navistar's outside immigration counsel; (2) Navistar initiated permanent residence applications for three other employees who transferred from Canada to Garland; and (3) Melanson communicated with Navistar's outside immigration counsel and HR officials regarding the status of his L-1A visa and permanent residence applications from April through October 2012, and no one ever told him that the company was not going to support either application. Navistar replies that these actions do not form a contract.

C

The court recognizes that the actions Melanson identifies can be considered circumstantial evidence of the existence of a contract. *See, e.g., Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex. App. 2000, pet. denied) ("The existence of an oral contract may be proved by circumstantial as well as direct evidence."). "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App. 2008, pet. denied). But the circumstantial evidence that Melanson adduces would not permit a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Navistar and Melanson regarding the essential terms of the purported agreement. Although each of these actions is consistent with Melanson's assertion that the parties formed a contract whereby Navistar agreed to support Melanson's permanent

residence application, a reasonable trier of fact would be left to speculate about whether the parties had a mutual understanding and assent regarding the essential terms of an agreement.

For example, a reasonable trier of fact would be unable to infer that Navistar agreed to support Melanson's permanent residence application merely because it identified him as an employee who might be transitioned to an L-1A visa. The fact that a Navistar employee obtained an L-1A visa would not entitle him to Navistar's sponsorship of a permanent residence application. Nor could a reasonable trier of fact infer that Navistar agreed to sponsor Melanson's permanent residence application merely because it initiated permanent residence petitions for other Navistar employees. It is undisputed that Navistar sponsored these other Canadian nationals for permanent residence because they, unlike Melanson, accepted employment at other U.S. Navistar locations after Navistar announced the closure of the Garland plant. Melanson, by contrast, did not accept other U.S.-based employment with the company and told several Navistar managers that he intended to return to Canada and would consider work in the United States only if he could commute from Canada. And, finally, the fact that Melanson communicated to Navistar's outside immigration counsel and HR specialists about his L-1A visa and permanent residence applications during the period between April and October 2012—and that none of these individuals informed him that Navistar would not support either application—would not enable a reasonable trier of fact to find that Navistar contracted to support his application for permanent residence. Melanson has not adduced any evidence—from these communications or any other part of the summary judgment record—that would enable a reasonable trier of fact to find that Navistar offered

to sponsor his permanent residence application.[6]

Because Melanson's response brief mentions three other factual predicates that could theoretically provide the foundation for his breach of contract claim, the court will consider each in turn.

## D

The first is the conversation between Melanson and Aguirre, which occurred before Melanson's relocation from Canada to Texas.  According to Melanson, it was during this conversation that Melanson told Navistar that he was interested in relocating to Texas only if Navistar agreed to change his visa classification from L-1B to L-1A and to support his permanent residence application.  Melanson described this conversation in his deposition testimony:

> Counsel:    What's the basis for your claim that you entered
>             a contract with the company?
>
> Melanson:   This was my discussion with the HR manager

---

[6]Melanson relies on *DerKevorkian v. Lionbridge Technologies, Inc.*, 2006 WL 197320 (D. Colo. Jan. 26, 2006) (Colorado law), *aff'd in part, rev'd in part*, 316 Fed. Appx. 727 (10th Cir. 2008), but that reliance is misplaced.  In *DerKevorkian* the plaintiff was able to point to a specific written agreement between the employer and the employee whereby the employer agreed to sponsor the employee's permanent residence application under the terms of the company's "Permanent Resident Program" in exchange for, *inter alia*, the employee's remaining with the company for two years following receipt of her green card. *Id.* at *1 (describing bargained-for exchange between employee and employer), and *3 (noting that contract was created by employer's agreement to sponsor employee under terms of Permanent Resident Program).  Here, by contrast, Melanson has failed to adduce evidence of a specific written or oral agreement with comparably definite terms.  Aguirre's statement that he "would work with corporate HR" is distinguishable from the detailed terms of the Permanent Resident Program in *DerKevorkian*.

- 13 -

|  |  |
|---|---|
|  | prior to me committing to coming here. |
| Counsel: | The HR manager, meaning Joel? |
| Melanson: | Joel Aguirre. |
| Counsel: | But what's the basis for saying you have a contract? *Just that conversation?* |
| Melanson: | *I would say yes.* |
| Counsel: | And what about the conversation do you believe gave rise to a contractual obligation? |
| Melanson: | Well, I made a pretty specific question to him about the residency card. |
| Counsel: | And what was your question? |
| Melanson: | Whether or not the company would get me one. Like for me to look at it, I was looking at it from the aspect that being Canadian and coming to the U.S., if anything happened I wouldn't be allowed to stay here.  If something happened to me, my wife wouldn't be allowed to stay here.  So I took that security that I had in Canada and sacrificed it to come to Texas.  And then I wanted something in return and that was my question.  I wanted the residency card for security obviously.  I wanted to retire here. |
|  | *     *     * |
| Counsel: | And what did Mr. Aguirre say in response to that question? |
| Melanson: | *He said he would work with corporate HR.* |

D. App. 46-47 (emphasis added).

A reasonable trier of fact could not find that there was an offer, an acceptance, and a

meeting of the minds between Navistar and Melanson.  The fact that Aguirre told Melanson that "he would work with corporate HR" would not enable a reasonable trier of fact to find that Navistar entered into a contract with Melanson whereby it agreed to a more specific obligation: to sponsor his permanent residence application.  Aguirre's response—which does not refer to the specific process of permanent residence sponsorship—is too indefinite to serve as the basis for the alleged contractual obligation here.  *See Coe v. Chesapeake Exploration, L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012) ("To be enforceable, the terms of an agreement must be sufficiently definite to enable the court to understand each party's obligations."); *Southern v. Goetting*, 353 S.W.3d 295, 299-300 (Tex. App. 2011, pet. denied) (citations omitted) ("The terms of an oral contract must be definite, certain, and clear as to all essential terms and, if they are not, the oral contract fails for indefiniteness.").  Aguirre's vague assurance that he would work with corporate HR—which is not definite, certain, or clear as to all essential terms—does not indicate that he promised Melanson that the company would support his permanent residence application.  *Cf. Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) ("An employee who has no formal agreement with his employer cannot construct one out of indefinite comments, encouragements, or assurances.").

Melanson argues that the lack of definiteness surrounding the alleged agreement between him and Navistar is not problematic because the only uncertain term is the time for performance, and Texas law allows a reasonable time to be inferred when no time for performance is stated in the agreement.  But this argument belies the degree of indefiniteness

that surrounds the alleged agreement.  This is not a case in which the other essential terms of the bargain *are* clear and the only uncertain term pertains to the time for performance. Rather, this is a case in which Melanson is attempting to derive a specific contractual obligation—to sponsor his permanent residence application—from a vague assurance that Aguirre "would work with corporate HR."[7]  In fact, the first case that Melanson cites underscores this distinction and supports Navistar's position.[8]  Melanson cites *Moore v. Dilworth*, 142 Tex. 538, 179 S.W.2d 940 (1944), for the proposition that, in general, "where no time of performance is stated in a contract, the law will imply a reasonable time."  *Id.* at 942.  But *Moore* held that the plaintiff's testimony about an alleged oral promise by the

---

[7]Melanson neither argues nor pleads that Aguirre's statement creates a contractual obligation that is distinct from the alleged obligation to support his permanent residence application.  He does not, for example, contend that the statement should be viewed as a promise to provide "best efforts."  *See, e.g., Hoffman v. L & M Arts*, 774 F.Supp.2d 826, 833-35 (N.D. Tex. 2011) (Fitzwater, C.J.) (discussing contracts under Texas law that obligate the use of "best efforts").  Because Melanson does not rely on this theory, the court need not decide whether Aguirre's statement could be legally enforceable as such a promise.

[8]The other cases that Melanson cites likewise fail to support his position.  Melanson relies on *Lake LBJ Municipal Utility District v. Coulson*, 692 S.W.2d 897 (Tex. App. 1985), *rev'd in part sub nom. Coulson v. Lake L.B.J. Mun. Utility Dist.*, 734 S.W.2d 649 (Tex. 1987), for the proposition that courts "routinely" supply a reasonable time for performance when the duration term is omitted.  But in *Coulson* there was "no dispute . . . about whether the agreement set forth in the footnote [of a written instrument] amount[ed] to a 'contract,' that is, a legally binding and enforceable agreement."  *Id.* at 906 (bracketed material added).

Melanson also cites *Heritage Resources, Inc. v. Anschutz Corp.*, 689 S.W.2d 952 (Tex. App. 1985, writ ref'd n.r.e.), which is also distinguishable.  In *Heritage Resources* the parties entered into a written joint venture agreement that clearly defined the nature and extent of their obligations.  *See id.* at 953.  The written instrument was merely "silent as to the time within which . . . payment was required."  *Id.* at 955.

defendant was "insufficient in law to establish a legally [enforceable] oral promise[.]" *Id.*
The Supreme Court of Texas explained that, even though the law will generally imply a
reasonable time for performance where an otherwise definite contract does not specify one,

> [i]t is [nevertheless] essential to the validity of a contract that it
> be sufficiently certain to define the nature and extent of [the
> parties'] obligations.  If an agreement is so indefinite as to make
> it impossible for a court to fix the legal liability of the parties
> thereto, it cannot constitute an [enforceable] contract.  So where
> a contract does not in some way specify its duration or time of
> performance, it is not [enforceable].

*Id.*  Here, as in *Moore*, Aguirre's statement that he would "work with corporate HR" is not
sufficiently certain to define the nature and extent of Navistar's obligations.  It does not, for
example, clarify the extent to which Aguirre must cooperate with corporate HR, much less
specify that Navistar is obligated to perform the specific task of sponsoring a permanent
residence application.  At most, Aguirre's statement indicates a willingness by Navistar to
sponsor Melanson's permanent residence application at some unspecified future date.  But,
under Texas law, "where an agreement leaves essential terms open for future negotiations,
it is not a binding contract but, rather, an unenforceable 'agreement to agree.'"  *Liberto v.
D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (quoting *Fort Worth Indep. Sch.
Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000), *superseded by statute as
recognized by Vantage Sys. Design, Inc. v. Raymondville Indep. Sch. Dist.*, 290 S.W.3d 312,
316 (Tex. App. 2009, pet. denied)).  The court therefore concludes that a reasonable trier of
fact could not find based on the oral conversation between Melanson and Aguirre that there
was an offer, an acceptance, and a meeting of the minds.  *See Searcy v. DDA, Inc.*, 201

S.W.3d 319, 323 (Tex. App. 2006, no pet.) (affirming summary judgment where there was

"no evidence of any meeting of the minds on the material terms of the alleged contract such

to indicate the legal obligations and liabilities of the parties"); *Wiley v. Bertelsen*, 770 S.W.2d

878, 883 (Tex. App. 1989, no writ) (affirming summary judgment where terms of offer and

acceptance were equivocal and lacked required specificity to be enforceable contract).[9]

## E

The second possibility is that Melanson's breach of contract claim is premised on the

Offer Letter.  The "Relocation" paragraph of the Offer Letter states: "Relocation will be

provided under the Navistar Global Relocation Policy G-140.  You will be transitioned to a

Navistar US employee at the time your US immigration paperwork allows."  D. App. 57.

MacDonald, who drafted the Offer Letter, testified that this language meant only that

Melanson, who had been a Navistar Canada employee, would become a Navistar U.S.

employee when he was legally allowed to work in the United States, and it is undisputed he

was already legally allowed to work in the United States because he already had an L-1B

visa.  In fact, Melanson obtained the L-1B visa in July 2010—more than one year before he

signed the Offer Letter on September 9, 2011.  No other provision in the Offer Letter

mentions relocation, much less an application for permanent residence.  And other provisions

of the Offer Letter make clear that Melanson's relocation to the Garland facility was a lateral

---

[9]Because the court concludes that a reasonable trier of fact could not find that there was an offer, an acceptance, and a meeting of the minds, it need not reach Navistar's argument that Aguirre did not have actual or apparent authority to enter into a contract concerning Melanson's application for permanent residence.

move and did not modify his at-will employment relationship with the company.  "Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and the court will construe it as a matter of law."  *Orthoflex*, 983 F.Supp.2d at 872 (citation and internal quotation marks omitted).  The court therefore holds that the unambiguous Offer Letter does not create a contractual obligation by Navistar to sponsor Melanson's permanent residence application.

F

The third possibility is that the 2012 Immigration Policy creates a contractual obligation on the part of Navistar to support Melanson's permanent residence application. After Melanson relocated to Texas, Navistar adopted the 2012 Immigration Policy, with an effective date of January 1, 2012.  The policy provides, in pertinent part, that to be eligible for permanent residence sponsorship, the employee must be actively employed in a full-time capacity for at least one year and have a Total Performance Management ("TPM") rating of 3 or above.  It is undisputed that Melanson had more than one year of employment at the Garland facility with a TPM rating of 3 or above.

But Melanson cannot base his breach of contract claim on the 2012 Immigration Policy for three reasons.  First, Melanson did not plead this theory in his complaint.  His complaint alleges, in pertinent part: "In September 2011, Plaintiff and Defendant entered into a contract whereby Defendant promised to support Plaintiff in obtaining permanent residency in the United States in exchange for Plaintiff's agreement to transfer to the Garland Assembly Plant."  Compl. ¶ 20.  The 2012 Immigration Policy did not become effective until

January 1, 2012, so it cannot form the factual predicate for Melanson's assertion that the parties entered into a contract in September 2011. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). Accordingly, Melanson cannot rely on allegations regarding the 2012 Immigration Policy to avoid summary judgment. *See, e.g., Days Inn Worldwide, Inc. v. Sonia Invs.*, 2006 WL 3103912, at *17 (N.D. Tex. Nov. 2, 2006) (Fitzwater, J.) (granting summary judgment and dismissing breach of contract claim where nonmovant attempted to rely on contracts not pleaded in live pleading).

Second, the 2012 Immigration Policy explicitly and unequivocally reserves Navistar's "right to amend, modify, suspend or terminate this Policy at any time based on changes in the law or based on business needs." D. App. 194. A manual or employee handbook of this sort, which allows the employer to unilaterally change the policies and practices described therein, "does not, of itself, constitute a binding contract for the benefits and policies stated unless the manual uses language clearly indicating an intent to do so." *Gamble v. Gregg County*, 932 S.W.2d 253, 255 (Tex. App. 1996, no writ); *see also Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 471 (5th Cir. 1991) (per curiam) ("Employee handbooks and manuals do not create contracts when the parties have not expressly agreed that the procedures contained in these materials are binding."). Melanson has not pointed to any part of the written policy that even arguably contains the sort of language necessary to express

an intent to confer contractual rights and obligations on the parties.  Absent this language, the policy cannot be construed as to create a binding contract.

Third, the court disagrees with Melanson's assertion that the 2012 Immigration Policy obligates Navistar to sponsor the permanent residence application of any employee who satisfies the two eligibility criteria (active employment of at least one year and a TPM rating of 3 or better).  Contrary to Melanson's conclusory assertion, the plain language of the policy clearly states that, separate and apart from the *eligibility criteria*, Navistar reserves the discretion to decide whether to sponsor an eligible employee based on other considerations, including the economic status of the business, current business requirements, and the approval of the relevant business unit.  *See* D. App. 203.  Accordingly, the policy does not *obligate* Navistar to sponsor the permanent residence application of employees who satisfy the eligibility criteria.  The eligibility criteria are necessary but not sufficient conditions for Navistar's decision to sponsor an employee's permanent residence application.  Accordingly, they cannot be construed as giving rise to a contractual obligation of the sort alleged by Melanson.

G

In sum, Melanson has not produced evidence from which a reasonable trier of fact could find that there was an offer, an acceptance, and a meeting of the minds whereby Navistar agreed to sponsor Melanson's application for permanent residence.  In particular, Melanson has not adduced evidence of a written or oral agreement evincing a mutual understanding and assent to the essential terms of the contract.  Even considering the parties'

actions that occurred after September 2011, a reasonable trier of fact could not find based on this evidence, in conjunction with the other evidence in the summary judgment record, that there was ever a meeting of the minds regarding sufficiently definite terms. Accordingly, Navistar is entitled to summary judgment on Melanson's breach of contract claim on the ground that Navistar failed to sponsor his permanent residence application.[10]

IV

Navistar moves for summary judgment dismissing Melanson's breach of fiduciary duty claim, contending that he cannot establish that Navistar owed him a fiduciary duty or that he was injured as a result of Navistar's failure to start the green card process.

A

"Under Texas law, '[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.'" *Days Inn Worldwide, Inc. v. Sonia Invs.*, 2007 WL 1188028, at *3 (N.D. Tex. Apr. 23, 2007) (Fitzwater, J.) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006, pet. denied)). Texas law recognizes two types of fiduciary relationships. *Jones*, 196 S.W.3d at 447. "The first is a formal fiduciary relationship, which arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Abetter Trucking Co. v.*

---

[10]Because the court concludes that Navistar is entitled to summary judgment on this basis, it need not reach Navistar's argument concerning the existence of a breach or damages.

*Arizpe*, 113 S.W.3d 503, 508 (Tex. App. 2003, no pet.) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)).  "The second is an informal fiduciary relationship, which may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'"  *Id.* (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)).

Melanson does not attempt to demonstrate the existence of a formal fiduciary relationship; rather, he purports to establish an informal fiduciary relationship.  He contends that Navistar owed him a fiduciary duty because it had a high degree of control over him, he placed a significant amount of trust and confidence in Navistar that the company would provide for his best interests in sponsoring his permanent residence application, and he relied on the superior knowledge of Navistar's outside immigration counsel and HR specialists to navigate the immigration process on his behalf.

An informal fiduciary relationship "may arise from a variety of relationships where the parties are 'under a duty to act for or give advice for the benefit of another upon matters within the scope of their relation.'"  *ARA Auto. Grp. v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) (quoting *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)).  "The existence of a fiduciary relationship, outside of formal relationships that automatically give rise to fiduciary duties, is usually a fact intensive inquiry."  *Id.* (citing *Moore*, 595 S.W.2d at 508).  "However, when the evidence offered is no evidence of a fiduciary relationship, the issue can be determined as a matter of law."  *Id.* (citing *Crim Truck &*

*Tractor v. Navistar Int'l*, 823 S.W.2d 591, 594 (Tex. 1992)).[11]   "Under Texas law, 'a fiduciary duty will not be lightly created' since 'it imposes extraordinary duties' and requires the fiduciary to 'put the interests of the beneficiary ahead of its own if the need arises.'"   *Id.* (quoting *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995)).

B

Melanson has failed to adduce evidence that would permit a reasonable trier of fact to find that Navistar owed him a fiduciary duty.   In a single paragraph, Melanson makes this conclusory assertion:

> Even before the Garland job offer was made, Navistar had a high degree of control and Melanson placed a significant amount of trust and confidence that Navistar would look after his best interests related to his ability to work in the United States.   This continuing relationship culminated with Navistar's promise and subsequent breach regarding Melanson's green card application.

P. Resp. Br. 18.   Melanson does not provide any other detail about this "high degree of control" that Navistar allegedly exhibited over him.   He does not identify *who* within the company exhibited the control.   Nor does he explain *how* Navistar exhibited the control over him.[12]   The summary judgment record establishes that Melanson was merely an at-will

---

[11]*Crim Truck* was superseded by statute on other grounds by Tex. Rev. Civ. Stat. Ann. art. 4413, § 6.06(e) (West 2001) (providing statutory duty of good faith and fair dealing among parties to a car dealership franchise agreement).   *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002).

[12]Texas cases note that the defendant's degree of control over the plaintiff is relevant when analyzing whether an informal fiduciary relationship exists.   But these cases typically recognize an informal fiduciary relationship only where the defendant has "disproportionate

employee during the relevant period.  Indeed, the Offer Letter confirms as much, explicitly stating: "Please be aware that your employment with Navistar is, at all times, at-will, meaning that either you or Navistar Inc. may terminate the relationship for any reason, with or without cause, and with or without advance notice."  D. App. 57.  An at-will employment relationship generally does not satisfy the strict standard for recognizing the existence of an informal fiduciary relationship.  *See, e.g., Gregan v. Kelly*, 355 S.W.3d 223, 230 (Tex. App. 2011, no pet.) (holding as a matter of law that there was no fiduciary relationship where there was no evidence that alleged relationship modified at-will nature of employment relationship).  If it did, the typical at-will employment relationship could be transformed into one that—with its attendant fiduciary obligations—required the employer to put the best interests of its employees ahead of its own.

Melanson relies on the fact that he trusted Navistar to support his permanent residence application, and he contends that he would not have moved from Canada to Texas without an assurance from Navistar that it would secure permanent residence status for him.  But

---

bargaining power and control" over the plaintiff.  *See, e.g., ARA Auto. Grp.*, 124 F.3d at 727.  The paradigmatic example of such a relationship is the insurance context, where an "unscrupulous insurer[] [could] take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims."  *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).  In this special context, the "insurance company has exclusive control over the evaluation, processing and denial of claims."  *Id.*  The same cannot be said for the ordinary commercial or employment relationship.  Not surprisingly, courts have interpreted *Arnold* narrowly, and they have refused to extend its holding to other contexts.  *See, e.g., Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 481 (Tex. App. 1989, writ denied) ("The 'special relationship' cause of action in tort for breach of the duty of good faith and fair dealing, however, does not extend to ordinary commercial contractual relationships such as the supplier-distributor relationship.").

Melanson has not adduced evidence that would enable a reasonable trier of fact to find that Navistar took any act suggesting that it assumed a special duty toward him. Melanson's unilateral, subjective trust is not enough to transform an at-will employment with Navistar into a fiduciary relationship. *See, e.g., Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) ("Furthermore, the fact that [the plaintiff] trusted [the defendant] does not transform their business arrangement into a fiduciary relationship."); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) ("However, mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship.").

Melanson also relies on the fact that Navistar's outside immigration counsel and HR specialists had superior knowledge about the immigration process. He contends that his emails requesting updates about his visa and green card application status demonstrate that he was relying on Navistar to address his concerns and ensure that he would be allowed to remain in the United States. This evidence, however, would not permit a reasonable trier of fact to find that Navistar agreed to put Melanson's best interests ahead of its own. *Cf. ARA Auto. Grp.*, 124 F.3d at 726-27 ("These two sophisticated businesses entered into a number of contracts for mutual benefit, but the evidence does not demonstrate that either party agreed to put the other's interests ahead of its own."). And Melanson's unilateral reliance on Navistar does not of itself create an informal fiduciary relationship. Even if Melanson is not a sophisticated party, and even if Navistar's immigration counsel and HR specialists knew more about the immigration process, Navistar's superior knowledge and Melanson's relative lack of sophistication, without more, do not give rise to a fiduciary duty. This conclusion

- 26 -

follows from the fact that Texas law does not recognize an informal fiduciary relationship

in a host of situations where one party is more sophisticated and has superior knowledge than

the other, such as the typical banking relationship between a bank and its customers. *See,*

*e.g., Wil-Roye Inv. Co. II v. Wa. Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. App. 2004, no

pet.) (noting that relationship between bank and its customers does not give rise to informal

fiduciary relationship despite bank's superior knowledge and greater sophistication).

Employers often possess more knowledge and greater sophistication than their employees,

especially where the employer's line of business touches on specialized and highly technical

subject matter.  If this were enough to create an informal fiduciary relationship, many

employers could be transformed into fiduciaries with fiduciary obligations  to their

employees.

Reinforcing the court's conclusion, Melanson fails to cite any authority that supports

the proposition that Texas law recognizes an informal fiduciary relationship in the context

of the typical employment relationship.  Although the court is aware of two cases in which

courts recognized fiduciary duties in the context of employee-employer relationships, both

involved an employee who assumed a special role vis-a-vis his employer.  In both, the

employee acted as a sales representative on behalf of the employer and had an undisclosed

adverse interest in the underlying business transaction. *See Molex, Inc. v. Nolen*, 759 F.2d

474, 479 (5th Cir. 1985) (per curiam) (employee-sales representative used alias to purchase

parts from employer and sold them to employer's third-party customer while receiving

commission from employer) (Texas law); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138

- 27 -

Tex. 565, 160 S.W.2d 509, 510-11 (1942) (employee-sales representative negotiated business deal on behalf of employer but did not disclose to employer that he would receive commission from third party on other side of transaction). In *Molex* and *Kinzbach* the fiduciary relationship appears to have flowed not from the employment relationship itself but from the special role the employee assumed on behalf of the employer in representing the employer's interests during the business transaction. Accordingly, these cases are inapposite.

C

In sum, Melanson has failed to adduce evidence that would enable a reasonable trier of fact to find that Navistar owed him a fiduciary duty. "[A] fiduciary duty will not be lightly created." *ARA Auto. Grp.*, 124 F.3d at 723 (quoting *Floors Unlimited*, 55 F.3d at 188). And given the absence of authority supporting Melanson's position, the court declines to accept it. Although there is evidence that Melanson subjectively trusted Navistar to support his permanent residence application, this is insufficient to create a fiduciary relationship, especially where, as here, it is undisputed that Melanson at all times remained an at-will employee. Accordingly, the court holds that Navistar is entitled to summary judgment dismissing Melanson's breach of fiduciary duty claim.[13]

---

[13]Because the court concludes that Navistar is entitled to summary judgment on this basis, it need not reach Navistar's argument that Melanson was not injured as a result of Navistar's not initiating the green card application process.

V

Finally, Navistar moves for summary judgment dismissing Melanson's breach of contract claim that is based on Navistar's alleged failure to honor the provisions of the company's International Assignment Policy.  Navistar contends that Melanson cannot establish that the policy applies to him, or, alternatively, that the policy's language expressly disclaims that it imposes any contractual obligations on the part of Navistar.

A

Melanson alleges as an alternative breach of contract claim that he is entitled to recover the expenses he incurred in relocating to Canada under Navistar's International Assignment Policy.  As a threshold matter, Melanson has failed to adduce evidence that would enable a reasonable trier of fact to find that he was covered by the policy.  As discussed above, the Offer Letter explicitly states that, by accepting the position at the Garland facility, Melanson would be "transitioned to a Navistar US employee." D. App. 57. According to Navistar, this language meant that Melanson's employment classification would be converted from a Navistar Canada employee doing project work temporarily in the United States to a Navistar U.S. employee living and working permanently in the United States.  Navistar's interpretation is supported by substantial evidence in the summary judgment record: (1) that the Offer Letter makes clear that Melanson's relocation would "be provided under the Navistar Global Relocation Policy G-140,"[14] not the International

_____

[14]It is undisputed that Navistar paid for Melanson's relocation expenses under the Global Relocation Policy G-140 when he relocated from Canada to Texas in September

Assignment Policy; (2) that Melanson was moved from the Canadian payroll to the U.S. payroll; (3) that Melanson began receiving his salary in U.S. currency rather than Canadian currency; and (4) that Melanson testified during his deposition that, when he accepted the relocation offer, he intended to retire in Texas.  Melanson's response does not directly engage this argument.  Instead, he makes the conclusory assertion that he "should be eligible for repatriation expenses under the program because he was essentially on a temporary assignment in the United States due to Navistar's decision to close the Garland plant, failure to extend Melanson's visa, and failure to begin the green card process."  P. Resp. Br. 21.  But his claim that he was "essentially on temporary assignment" is not supported by summary judgment evidence.  In particular, Melanson has not adduced any evidence that Navistar intended to close the Garland plant when it provided the Offer Letter to him in August 2011, or that Navistar considered his acceptance of the Garland position a "temporary assignment." Melanson's conclusory assertion—unsupported by a proper citation to the summary judgment record—that he is entitled to repatriation expenses under Navistar's International Assignment Policy is insufficient to preclude summary judgment.  *See, e.g., Choe v. Bank of Am., N.A.*, 2014 WL 2438378, at *3 (N.D. Tex. May 30, 2014) (Fitzwater, C.J.), *appeal docketed*, 14-10826 (5th Cir. July 24, 2014); *see also Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)) ("'[C]onclusory allegations, speculation, and unsubstantiated assertions are

---

2011.

inadequate to satisfy' the nonmovant's burden in a motion for summary judgment."). Accordingly, Navistar is entitled to summary judgment dismissing Melanson's breach of contract claim that is based on the premise that Navistar failed to honor the provisions of the International Assignment Policy.

B

Alternatively, the court holds that, even if Melanson was covered by the International Assignment Policy, the policy did not create a contractual obligation by Navistar to pay for Melanson's repatriation expenses.   As Navistar points out in its opening brief, the International Assignment Policy conspicuously and ambiguously states:

> This Policy is intended to provide general information and guidance to employees.  It is not a contract of employment or a guarantee of continued employment. The Company reserves the right to change or discontinue any of the policies, practice, provisions, and benefits set forth in this Policy at any time without notice. . . .  No member of Company management has the authority to bind the Company to any terms of employment inconsistent with the provisions and policies of this document. . . .  The policy is written in a manner that addresses the majority of situations which arise as a result of an international assignment.   Where unique conditions or circumstances create situations not covered by this policy, the Company reserves the right to develop and/or adapt policies necessary to address the situation.

D. App. 213. Navistar argues that, given this express disclaimer, the policy cannot be construed to create a binding contract.  Melanson's response does not address this argument. His failure to do so necessarily means that he has failed to designate specific facts showing that there is a genuine issue regarding whether the International Assignment Policy includes

language that clearly indicates an intent to create a binding contract.  As discussed above, this type of policy—in which an employer retains a unilateral right to change the terms—does not create a binding contract "unless the manual uses language clearly indicating an intent to do so."  *Gamble*, 932 S.W.2d at 255; *see also Zimmerman*, 932 F.2d at 471.  Because Melanson has failed to adduce evidence that the International Assignment Policy contains such language, Navistar is entitled to summary judgment on this alternative basis.

VI

Navistar has filed a counterclaim that alleges claims against Melanson for unjust enrichment, "money had and received," and promissory estoppel.  It seeks to recover attorney's fees and pre- and post-judgment interest.  It does not, however, move for summary judgment as to its counterclaim.  Navistar may wish to withdraw the counterclaim to enable the court to enter a final judgment based on today's memorandum opinion and order.  If it does not do so, a final judgment will not be entered until the counterclaim is resolved by trial.

*   *   *

For the reasons explained, Navistar's motion for summary judgment is granted, and Melanson's action is dismissed with prejudice.  Unless withdrawn, the claims asserted in Navistar's counterclaim remain for trial.

**SO ORDERED.**

September 4, 2014.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

- 33 -